IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BURCHICK CONSTRUCTION COMPANY, INC., | ) ) ) | |
| Plaintiff, | ) ) | Civil Docket No. 05-CV-12E |
| vs. | ) ) | |
| HBE CORPORATION, | ) ) | Judge McLaughlin |
| Defendant. | ) | (Electronically Filed) |

## PLAINTIFF'S PRE-TRIAL STATEMENT

Plaintiff, Burchick Construction Company, Inc. ("Burchick"), by and through its

attorneys, Reed Smith LLP, files the following Pre-Trial Statement:

### I.    NARRATIVE STATEMENT

#### The Parties

Burchick is a closely-held corporation organized and existing under the laws of the

Commonwealth of Pennsylvania, having its principal place of business at 500 Lowries Run Road

Pittsburgh, PA 15237.   It operates as both a general contractor and as a subcontractor

performing the concrete portions of commercial and industrial projects.  Burchick performs the

vast majority of its work in Western Pennsylvania.

Defendant HBE Corporation ("HBE"), is a corporation organized and existing under the

law of the state of Delaware, having its principal place of business at 11330 Olive Boulevard, St.

Louis, Missouri.  HBE markets itself as a fully integrated, design-builder of hospital and financial facilities, with an in-house design professional staff of approximately 250 people.

**The Project**

In 2002, UPMC Northwest ("UPMC"), a Pennsylvania non-profit corporation, determined to construct a new 210,000 square foot hospital (the "Hospital") and a related Behavorial Health Facility (the "BHF") in Seneca, Pennsylvania (the Hospital and the BHF sometimes referred to collectively herein as the "Project").  UPMC retained HBE to both perform complete design services for the Project, and to act as the general contractor for the construction of the Project.  To that end, UPMC entered into a contract with HBE for $51,542,412.00 (including change orders) for the Hospital, and a contract with HBE for $2,805,433.00 (including change orders) for the BHF.

HBE provided complete design services for the Project, and the two HBE-employed architects of record are Frederick S. Scott and Ronald L. Hollander.   UPMC also provided its own employees in a supervisory capacity.  Specifically, George D. Ehringer, a registered architect employed by UPMC, was UPMC's Project Manager who was responsible for overseeing the budget and general scheduling for the entire Project from UPMC's standpoint.  UPMC also assigned John Williams to review work performed in the field.  In addition, UPMC took the progressive step of purchasing and administering an "Owner Controlled Insurance Program" ("OCIP") on the Project.  Under the OCIP, UPMC purchased, owned and administered a global insurance policy which covered all parties performing work on the Project for certain types of insurance.  OCIP's are generally utilized on large projects, because the owner can ensure it receives the insurance coverage it needs to protect its interests, and because OCIP's generally save the owner 1-2% in project costs.

HBE retained Burchick to perform certain concrete work on each of the Hospital and BHF projects. Specifically with respect to the Hospital, Burchick and HBE entered into a contract dated August 14, 2002 (the "Hospital Contract"), whereby Burchick would provide the "Concrete and Foundations Package" as that scope of work was enumerated in the contract documents prepared by HBE, for an original principal amount of $2,225,000.00, as finally adjusted by agreed-upon change orders to $2,366,573.00. Burchick and HBE also entered into a contract dated August 16, 2002 (the "BHF Contract"), whereby Burchick would provide the "Concrete and Foundations Package" on the BHF for an original principal amount of $395,500, as finally adjusted by agreed-upon change orders to $454,708.00. The language and terms of each of the Hospital Contract and the BHF Contract are identical (the Hospital Contract and the BHF Contract sometimes referred to collectively as the "Contracts").

The Contracts, and the parties obligations under them, are subject to Pennsylvania's Contractor and Subcontractor Payment Act, 73 P.S. § 501 et seq. (the "Prompt Pay Act") because they are agreements to perform work on real property within the Commonwealth other than to improvements on six or fewer residential units.

## The Hospital Contract

Construction of the Hospital began in the late Summer of 2002, and by virtue of the type of work covered in Burchick's scope of work under the Hospital Contract, Burchick was one of the first contractors to perform work on the Hospital; and began its work in or about September 2002. Burchick staffed its work on the Hospital Contract in its normal fashion, i.e., it utilized David Meuschke as the Project Manager, responsible for the overall administration of Burchick's work and Daniel Trobee and Gary Schmidt worked as the Job Superintendents, responsible for day-to-day on-site coordination and operation. In addition to subcontractors and material

suppliers, the cement masons, carpenters and laborers necessary for Burchick's work were hired out of the local union hall, as required by applicable labor agreements.

As required by the Hospital Contract, Burchick submitted Applications for Progress Payments on a monthly basis, based upon a Schedule of Values approved by HBE which indicate the percentage of discrete elements of the work completed by Burchick in each month. These Applications for Progress Payments were comprised of a "Subcontractor Payment Application And Waiver Form" and a "Contractors Monthly Billing Form," both of which were supplied to Burchick by HBE. HBE required that its forms be used. The "Contractors Monthly Billing Form" indicated all of the distinct elements of work called for by the Hospital Contract, the percent complete of each element of work, the total dollar amount of the payment request and the balance left to complete the work. These "Contractors Monthly Billing Forms" were approved for payment by HBE's Site Superintendent. Burchick would then be entitled to payment of the scheduled amount of work completed and approved, less retainage, to be paid within ten (10) working days after HBE received payment for Burchick's work from UPMC. The Hospital Contract called for retainage of ten percent (10%) until "substantial completion," at which time the retainage was to be reduced to five percent (5%). In addition, Burchick submitted all information required by the Contracts or otherwise by HBE which would entitle it to be paid, including lien waivers and OCIP information, on forms, or in content, prescribed by HBE.

HBE, in turn, submitted its "Application And Certification For Payment" on a monthly basis to UPMC. These applications for payment also identified all of the discrete elements of the work on the Project by description and number. All of Burchick's work under the Hospital Contract is included within the descriptions for "60 – Concrete Form," "70 – Build Concrete," "72 – Concrete Finish," "75 – Rebar/Mesh," and "80 – Concrete Equip." For each such work

item, the scheduled value of the work, the amount of work in place, the percent complete and the

balance to finish is reflected on the application for payment.   The applications for payment were

signed by HBE's architects and included the following certification:

> "The Architect certifies to the Owner that to the best of the Architect's knowledge,
> information and belief the Work has progressed as indicated, the quality of the Work is in
> accordance with the Contract Documents, and the Contractor is entitled to payment of the
> AMOUNT CERTIFIED."

If UPMC's George D. Ehringer agreed, he would also sign HBE's application for

payment and payment would be made to HBE via wire transfer.

Burchick's work under the Hospital Contract proceeded well, and Burchick submitted

monthly payment applications beginning in September, 2002 and continuing each month through

July, 2003.   As of May 30, 2003, Burchick's work was substantially complete and Burchick

notified HBE of this fact in writing. Thereafter, Burchick achieved final completion, corrected

any work which HBE claimed was deficient, and performed its required clean-up activities.

Burchick submitted its Payment Application number 13 on July 29, 2003, which requested 100%

of the contract balance, including all retainage.[1]   Again, Burchick notified HBE of this fact

verbally on-site and in writing, and requested, again, that HBE pay Burchick the remaining

balance owed under the Hospital Contract which at that time exceeded $370,000.00.

Subsequently, HBE made several late payments, with money trickling in between February 2004

and February 2005.  HBE completely ignored (or was unaware) of its obligations under the

Prompt Pay Act, which is discussed in greater detail, _infra_.  Eventually, albeit late, HBE paid

---

[1] Application for Payment 14 was submitted October 29, 2003 to reflect an additional change
order to which retainage did not apply.

Burchick the balance under the Hospital Contract with the exception of remaining retainage of $92,409.05.[2]

However, HBE refused to pay Burchick the remaining contract balance, claiming that it had not received payment of retainage from UPMC, and thus did not owe Burchick its final payment. However, HBE did inform Burchick that it would pay Burchick its retainage when "the owner releases this portion of our retention" – which is what HBE is obligated to do under the Prompt Pay Act, and, under the Contracts in any event.

However, at that time, and unbeknownst to Burchick, HBE had submitted its certified Payment Application number 18 to UPMC dated July 18, 2003, requesting payment for 100% of Burchick's work. UPMC in fact paid HBE for 100% of Burchick's work on or about July 25, 2003. Further, UPMC is holding no more than $159,000 in total retainage from HBE on the entire $51,542,412.00 Hospital project (**.3%**) – none of which relates in any way to any of Burchick's work.

While HBE was telling Burchick it couldn't (or wouldn't) pay it its final retainage because it had not been paid retainage from UPMC, it was telling a different story to UPMC. After months went by without payment, Burchick began to ask UPMC about the payment status. As late as February, 2004, HBE was informing UPMC that HBE was not making final payment to Burchick because of issues other than retainage.

However, discovery conducted in this Action has finally disclosed HBE's true position with respect to what it maintains are its payment obligations under the Contracts. Specifically,

---

[2] Burchick was owed $92,410.05 under the Hospital Contract as of February 1, 2005, however, on February 3, 2005, Burchick received a payment from HBE of $31,757.65. As HBE did not provide any explanation as to what invoice(s) this payment related to, Burchick applied the payment against the Hospital Contract, leaving a balance of $60,652.40.

HBE unilaterally created what is essentially a pool of retainage with UPMC which is not specifically allocated to any single subcontractor.  Rather, HBE has taken the position that if any retainage is held by UPMC, HBE may, in its discretion, allocate it among all subcontractors, regardless of whether any of the money is in fact held back because that subcontractor's work is not yet complete.  Notwithstanding the payment language cited above, HBE relies on the phrase "which retainage shall be held by Contractor [HBE] until final payment is received by Contractor [HBE] from Owner [UPMC]" to argue that unless and until HBE receives every single dollar for the entire Project from UPMC, it does not owe any retainage to any subcontractor – even where, as here, UPMC holds no more than .3% of the total contract value!  For example, the excavation subcontractor, who would be the first subcontractor on the Project, would not be entitled to its retainage for at least a few years because all retainage obviously would not be paid until the end of the Project – in effect HBE would be using that subcontractor's money as an interest-free loan.

However, HBE's position is statutorily precluded by the application of the Prompt Pay Act.  The Pennsylvania legislature has seen fit to put a stop to this kind of game-playing by big contractors by enactment of the Prompt Pay Act.  Specifically, the Prompt Pay Act specifically addresses "Retainage" at Section 509(c) and (d):

> (c)  Payment of retainage to subcontractors – A contractor shall pay to the contractor's subcontractors, and each subcontractor shall in turn pay to the subcontractor's subcontractors, within 14 days after receipt of the retainage, the full amount due each subcontractor.

> (d)  Withholding acceptance or failure to pay retainage – If an owner, contractor or subcontractor unreasonably withholds acceptance of work or fails to pay retainage as required by this section, the owner, contractor or subcontractor shall be subject to the payment of interest at the rate established in section 5(d) on the balance due and owing on the date acceptance was unreasonably withheld or the date the retainage was due and

owing, whichever is applicable.  The owner, contractor or subcontractor shall also be subject to the provisions of section 12."

Finally the Prompt Pay Act provides at Section 511 "Contractor's withholding of payment for good faith claims":

(a)  Authority to withhold – The contractor or subcontractor may withhold payment from any subcontractor responsible for a deficiency item.  The contractor or subcontractor shall pay any subcontractor according to the provisions of this act for any item which appears on the invoice and has been satisfactorily completed.

(b)  Notice – If a contractor or subcontractor withholds payment from a subcontractor for a deficiency item, it must notify the subcontractor or supplier and the owner of the reason within seven calendar days of the date after receipt of the notice of deficiency item.

The Prompt Pay Act is unequivocal.  If the owner pays the general contractor for the subcontractor's retainage, and the general contractor does not give notice of a "deficiency item," prior to the expiration of the 14 day period in Section 509(c), the general contractor must pay the retainage to the subcontractor.  This provision may not be modified by contract.

Even if the Prompt Pay Act did not address this situation, a read of the Contracts makes it clear that HBE's position is unsupportable.  First, the relevant portion of the Contracts states: "Subcontractor shall be entitled to receive all progress payments and the final payment within ten (10) working days after Contractor receives payment *for such* from the Owner, except as otherwise provided in the Conditions." (emphasis added).

The contractual language clearly entitles Burchick to be paid its retainage within ten (10) working days of when UPMC pays HBE for Burchick's work.  The Contracts do not contemplate a situation where HBE can unilaterally assign retainage to all subcontractors to avoid its payment obligations.  To allow HBE to do this would make all retainage payment provisions of the Contracts illusory.

Thus, Burchick is entitled to its retainage, both under the Prompt Pay Act and the Contracts no later than ten (10) working days after HBE receives it from UPMC, and in any event, no later than 14 days after Burchick billed for it.   HBE received all retainage related to Burchick's work on July 25, 2003, and Burchick billed for it on October 29, 2003.  HBE had no basis to withhold payment, and in any event, did not give notice of any alleged "deficiency item" such that it could have withheld payment under Section 511 of the Prompt Pay Act.  If HBE receives the retainage from UPMC, and does not give notice of a deficiency item before payment of the retainage is due, HBE has a mandatory obligation to pay that retainage.  If they do not, interest shall be imposed under the Prompt Pay Act at 1% per month.  If an unpaid subcontractor is forced to initiate litigation to recover, it is entitled to a penalty equal to 1% per month and attorneys' fees.  A contractor may not withhold payment otherwise due for months in the hope that it can manufacture a "backcharge" – yet this is precisely what HBE did, as more fully discussed below.

Notwithstanding that Burchick substantially completed the Hospital Contract by May 30, 2003 and completed every item of work, including the repair of deficiencies identified by HBE, by September 26, 2003, HBE still refused to pay Burchick.  Then, after almost five (5) months, HBE sent Burchick its "Punchlist" on February 4, 2004.  Notwithstanding its untimely nature, Burchick completed those items identified by HBE by February 10, 2004, with the exception of certain construction joints, which HBE then accepted as constructed, and filling of certain cracks in the concrete slab on grade.  These cracks in the slab on grade were not caused by Burchick, as Burchick placed the concrete, and installed control and construction joints, in accordance with the contract documents.

Notwithstanding the fact that Burchick had fully complied with all requirements of the contract documents, HBE then asked for a meeting to discuss this slab on grade cracking issue.  Burchick agreed, and a meeting was held between authorized representatives of Burchick and HBE on February 26, 2004.  At that meeting, a full settlement and compromise was reached,

whererby Burchick agreed, at its expense, to fill cracks in the slab on grade, and HBE agreed that Burchick's Contract obligations were met (especially since the 5 month late Punchlist had been completed).[3]  In accordance with that settlement agreement Burchick filled the cracks in the slab on grade and completed its work by March 18, 2004.  At that time Burchick confirmed that all requirements of the settlement agreement had been reached in a letter to HBE dated March 22, 2004.  HBE responded by letter dated March 29, 2004 by stating that it agreed that backcharges, known to date, had been resolved, but that HBE still had not received retainage from UPMC, and thus could not pay Burchick.  The only reason given by HBE for non-payment of the complete contract balance was the allegation that HBE had not been paid for Burchick's retention.

### The "Backcharge"

After several more months of non-payment, HBE then claimed in May, 2004, for the first time, that Burchick's concrete installation did not comply with certain requirements of the contract specifications regarding the flatness and levelness of the concrete floor slabs.  HBE apparently based this assertion solely on the fact that its finish flooring installers were complaining about the conditions of the floors.  Because a determination of compliance with the specifications at issue requires specialized and precise testing, Burchick requested that the inspection reports/analyses that showed these alleged deficiencies be forwarded to them.  HBE responded that it was their intention to hire an independent firm and have them complete a floor slab survey and a petrographic analysis.  HBE further represented that if those surveys supported HBE's position, HBE would look to Burchick to cover the cost of report.  HBE told Burchick that it would provide it with a copy of those survey documents.

---

3 Burchick always maintained that it was not responsible for any cracks in the slab on grade, but agreed to repair certain cracks as an accommodation to HBE to complete the settlement agreement.

Burchick waited for these surveys and/or analyses – but they never came.  In fact, discovery has disclosed that no such testing was ever performed.   Instead, HBE apparently simply allowed its flooring subcontractors to do whatever they wanted to the floors with the idea that they would get Burchick to pay for it.  These flooring subcontractors had every incentive to push as much responsibility for the work as possible onto Burchick, since to do so made their job easier, cheaper, and thus more profitable.

While Burchick was waiting for the data that HBE said was coming, HBE was apparently paying these flooring subcontractors and others to do work that is the subject of the Counterclaim in this Action.  HBE waited until December, 2004 to inform Burchick that it was attempting to backcharge them $73,140.00 for work allegedly related to these exact same issues. This $73,140.00 is a discrete portion of HBE's counterclaim in this litigation.

This counterclaim is based on alleged failure to comply with specifications for which HBE has done no testing and for which HBE had given Burchick no notice or chance to cure.  In addition, HBE appears to have conveniently forgotten about the settlement agreement reached at the February 26, 2004 meeting, which resolved the same issue covered by the "backcharge." Further, HBE has materially modified the floor slab conditions for which it now sues Burchick, without giving prior notice to Burchick.  Burchick has no ability to now test for compliance with the specifications and thus HBE is guilty of spoliation.[4]

### The OCIP "Reconciliation"

Not satisfied with asserting its unfounded "backcharge," on the Hospital Contract, HBE waited until April, 2005 (almost two years after Burchick completed the Hospital Contract and about two months after this Action was filed) to inform Burchick that it was performing an audit

---

[4] Burchick reserves the right to file a Motion in Limine on this and any other issues.

of the Project payroll records, and demanded that Burchick supply additional payroll information and insurance rate information for its so-called "OCIP reconciliation."  Incredibly, HBE informed Burchick that "until all this data has all been submitted and audited, we are unable to close out your Subcontract, and release final payments."  There is absolutely no basis in the Contracts by which HBE may refuse to pay subcontractors for monies earned pending any such "reconciliation."

As briefly mentioned above the OCIP is owned and controlled by UPMC.  When UPMC decided it would utilize an OCIP on the Project, HBE was required to submit a revised bid, reducing its price to take into account the fact that HBE, and its subcontractors, would not have to purchase insurance for the Project.  HBE calculated its reduced price by simply obtaining a quote from its insurance broker as to what the insurance would have cost it, and by obtaining "credits" from its subcontractors based on what those subcontractors expected it would have cost them to purchase insurance.  HBE then added up those figures which came to $1,746,348.00, and then reduced its price to UPMC for the Hospital by $1,750,000.00 – by the same amount that it would have cost HBE to obtain the insurance.  HBE performed the same exercise with respect to the BHF.

HBE's 11th hour injection of this issue (after this Action was filed) is simply an effort to manufacture a set-off/counterclaim in response to Burchick's affirmative claim.  First, the language of the Contracts does not allow for an after-the-fact adjustment.  In addition, HBE's own witness has confirmed that UPMC has not made any claim against HBE for an additional credit for OCIP premiums and cannot, as the contract adjustment between HBE and UPMC was finalized before the Project began.   Notwithstanding the fact that HBE does not owe UPMC any money related to the OCIP and thus HBE has not incurred any actual damages, HBE wants money from Burchick.  That is, HBE has never incurred, and never will incur, any cost associated with the OCIP, but wants Burchick to pay it "in excess of $40,000 in additional OCIP

credits" as set forth in its Counterclaim.  There is no basis in the Contracts, or otherwise, for this claim.

## The BHF Contract

The documents, procedures and individuals involved in the BHF Contract were exactly the same as in the Hospital.  The work on those two Contracts proceeded almost concurrently. Construction of the BHF began in the late Fall of 2002, and by virtue of the type of work covered in Burchick's scope of work under the BHF Contract, Burchick was again one of the first contractors to perform work on the BHF, and began its work in December 2002.  Again, Burchick staffed its work on the BHF Contract in its normal fashion, i.e., it utilized David Meuschke as the Project Manager, responsible for the overall administration of Burchick's work and Daniel Trobee and Gary Schmidt worked as the Job Superintendents, responsible for day to day on-site coordination and operation.  In addition to subcontractors and material suppliers, the cement masons, carpenters and laborers necessary for Burchick's work were hired out of the local union hall, as required by applicable labor agreements.

The payment application and approval process, including the involvement of UPMC, was exactly the same on the BHF Contract as on the Hospital Contract.  Burchick's work under the BHF Contract proceeded well, and Burchick submitted monthly payment applications beginning in December 2002.  Burchick substantially completed performance of the BHF Contract on September 23, 2003, and fully completed performance on September 26, 2003.  Burchick submitted its Application for Payment No. 8 on October 23, 2003 wherein Burchick represented that its work on the BHF Contract was 100% complete and requested payment for 100% of the balance, including retainage.[5]  HBE failed to pay Burchick the final $48,658.00 of retainage due

_____

[5] Application for Payment No. 9 was submitted February 4, 2004 to reflect an additional change order to which retainage did not apply.

under the BHF Contract.  As with the Hospital Contract, the HBE-UPMC payment records disclose that HBE was paid for 100% of Burchick's work no later than October, 2003.

HBE has similarly ignored its obligations under the Prompt Pay Act with respect to the BHF Contract and never paid Burchick, notwithstanding that HBE has been paid in full by UPMC, and notwithstanding that HBE does not assert any construction-related backcharge as a counterclaim in this Action.

HBE's contract interpretation, and position on final payment, is the same on both the Hospital Contract and the BHF Contract.  Further, HBE's OCIP counterclaim apparently includes a claim related to the BHF Contract.  Just as it did with respect to the Hospital Contract, HBE never raised this issue until April, 2005.

<u>**The Performance Bond Claim**</u>

HBE continues to attempt to manufacture defenses/counterclaims to Burchick's position. Specifically, HBE's own witnesses all agree that all work required by Burchick under the Hospital Contract and the BHF Contract is complete.  Yet, HBE has asserted a claim against Burchick's performance bond in October, 2005 for both the Contracts.  Of course, HBE has wholly failed to inform the bonding company what this so-called "claim" is for or what basis they have for making such a claim.  HBE has no legitimate basis to make such a claim, and this claim should be recognized for what it is – a baseless and transparent attempt to bolster its position in this litigation.

## II.     <u>STATEMENT OF DAMAGES</u>

<u>Hospital Contract</u>

Burchick is entitled to the remaining contract balance under the Hospital Contract of $60,652.40.  In addition, pursuant to the Prompt Pay Act, Burchick is entitled to interest at the

rate of 1% per month beginning no later than 14 days after receipt of Burchick's payment application for its final payment of retainage (July 29, 2003 plus 14 days – August 13, 2003). Through December 18, 2005 (28 months @ 1% per month), interest has accrued of $16,982.67. In addition, because Burchick was forced to commence litigation to recover this amount wrongfully withheld, Burchick is entitled to be paid a penalty of 1% per month together with Burchick's attorneys' fees.  The penalty of 1% per month has similarly accrued and is $16,982.67.  Attorneys' fees for collection efforts for both Contracts currently stand at $33,125.00.

| | |
|---|---|
| Principal Contract Balance: | $60,652.40 |
| Interest through 12-18-05 | $16,982.67 |
| Penalty through 12-18-05 | $16,982.67 |
| Total attorneys' fees to 10-31-05 | $33,125.00 |
| **TOTAL:** | **$127,742.74**[6] |
| (Alternative attorneys' fees based on percentage of total principal claim - $60,652.40/$109,310.40 = 55% [$33,125.00] =) | $18,218.75 |
| **ALTERNATE TOTAL:** | **$112,836.49** |

BHF Contract

Burchick is entitled to the remaining contract balance under the BHF Contract of $48,658.00.  In addition, pursuant to the Prompt Pay Act, Burchick is entitled to interest at the rate of 1% per month beginning no later than 14 days after receipt of Burchick's payment application for its final payment of retainage (September 30, 2003 plus 14 days – October 14, 2003).  Through December 18, 2005 (26 months @ 1% per month), interest has accrued in the amount of $12,651.08.  In addition, because Burchick was forced to commence litigation to

---

6 Attorneys' fees, interest and penalties continue to accrue and these damage figures will be updated at trial.

recover this amount wrongfully withheld, Burchick is entitled to be paid a penalty of 1% per month together with Burchick's attorneys' fees. The penalty of 1% per month has similarly accrued in the amount of $12,651.08. Attorneys' fees for collection efforts for both Contracts currently stand at $33,125.00.

| | |
|---|---|
| Principal Contract Balance: | $48,658.00 |
| Interest through 12-18-05 | $12,651.08 |
| Penalty through 12-18-05 | $12,651.08 |
| Attorneys' fees to 10-31-05 | $ included above |
| **TOTAL:** | **$73,960.16**[7] |
| (Alternative attorneys' fees based on percentage of total principal claim - $48,658.00/$109,310.40 = 45% [$33,125.00]) = | $14,906.25 |
| **ALTERNATE TOTAL**: | **$88,866.41** |

## III. WITNESSES

Witnesses whom Burchick expects to call:                    Liability and/or Damage

1.    Joseph Burchick                                                    L and D
      President
      Burchick Construction Company, Inc.
      500 Lowries Run Road
      Pittsburgh, PA 15237
      (412) 369-9700

2.    David Meuschke                                                   L and D
      Vice President
      Burchick Construction Company, Inc.
      500 Lowries Run Road
      Pittsburgh, PA 15237
      (412) 369-9700

---

[7] Attorneys' fees, interest and penalties continue to accrue and these damage figures will be updated at trial.

3.      Gary Schmidt                                    L
        Job Superintendent
        Burchick Construction Company, Inc.
        500 Lowries Run Road
        Pittsburgh, PA 15237
        (412) 369-9700

4.      George Ehringer, AIA                            L and D
        144 N. Jamestown Road
        Moon, PA 15108
        (412) 262-3581

5.      Sue Blank                                       L and D
        Office Manager
        Burchick Construction Company, Inc.
        500 Lowries Run Road
        Pittsburgh, PA 15237
        (412) 369-9700

Witnesses whom Burchick may call if the need arises:

6.      Accounts Payable Representative of UPMC         L and D
        9100 Babcock Boulevard
        Pittsburgh, PA
        (412) 367-6638

7.      Bill Boots                                      L
        Hilb, Rogal and Hamilton Company of Pittsburgh, LLC
        600 Grant Street
        U.S. Steel Tower
        Suite 5500
        Pittsburgh, PA 15219
        (412) 281-3353

8.      John Williams                                   L and D
        UPMC Northwest
        100 Fairfield Drive
        Seneca, PA 16346
        (814) 676-7600

9.      James Kee                                       L and D
        HBE Corporation
        11330 Olive Boulevard
        St. Louis, MO

Mr. Kee's testimony may be presented by means of transcript of deposition given on September 22, 2005. It is anticipated that pages 19-24, 35, 36,38-49, 53-63, 70, 71, 82-86, 88, 99, 100, 113-116 may be presented, although Burchick reserves the right to offer additional pages.

10.    Rollin Cooper                                    L
HBE Corporation
11330 Olive Boulevard
St. Louis, MO
Mr. Coopers' testimony may be presented by means of deposition transcript. Because HBE failed to produce Mr. Cooper as a Rule 30(b)(6) witness for deposition until December 5, 2005, several months after the Rule 30(b)(6) Notice of Deposition was issued, the transcripts are not yet complete.  Burchick reserves the right to offer all or any portion of that transcript.

11.    Hugh Adkins                                      L
HBE Corporation
11330 Olive Boulevard
St. Louis, MO
Mr. Adkins' testimony may be presented by means of deposition transcript. Because HBE failed to produce Mr. Adkins as a Rule 30(b)(6) witness for deposition until December 5, 2005, several months after the Rule 30(b)(6) Notice of Deposition was issued, the transcripts are not yet complete.  Burchick reserves the right to offer all or any portion of that transcript.

12.    Any witness listed by Defendant in its Pre-Trial Statement.

13.    Burchick reserves the right to call additional witnesses by way of rebuttal or

impeachment.


## IV.    LIST OF EXHIBITS THAT BURCHICK EXPECTS TO OFFER

1.    Contract Drawings, including without limitation, Drawing Sheets TS and EBTS marked as a collective exhibit.

2.    August 14, 2002 Subcontract between Contractor Hospital Building & Equipment Company and Subcontractor Burchick Construction Co. (D-53).

3.    HBE – UPMC Northwest "Concrete and Foundations Package" Specification and Conditions

4.    HBE – UPMC Northwest Mechanical/Electrical Specifications and Conditions

5.      August 16, 2002 Subcontract between Contractor Hospital Building & Equipment Company, Division of HBE Corporation and Subcontractor Burchick Construction Co.

6.      HBE – UPMC Northwest Behavorial Health Facility Specifications and Conditions

7.      November 30, 2001 Construction Contract between UPMC Northwest and HBE Corporation.

8.      August 15, 2002 fax transmittal of August 12, 2002 OCIP Administration Form and insurance certificate (BUR 001-0005).

9.      September 26, 2002 transmittal letter from Susan B. Blank to Bill Boots enclosing September 17, 2002 OCIP Administrative Form for Tri-City Steel (BUR 0006-0010).

10.     October 14, 2002 transmittal letter from Susan B. Blank to Bill Boots enclosing October 1, 2002 OCIP Administrative Form for AMB Excavating, Inc. (BUR 0011-0014)

11.     Subcontractor Burchick Construction Company's Payment Application Package No. 1 for Contract 03330-5187 for $229,230.00 and payment check number 71646 dated November 8, 2002.

12.     Subcontractor Burchick Construction Company's Payment Application Package No. 2 for Contract 03330-5187 for $515,520.00 and payment check number 719150, dated December 20, 2002.

13.     Subcontractor Burchick Construction Company's Payment Application Package No. 3 for Contract 03330-5187 $353,475.00 and payment check number 72164 dated January 30, 2003.

14.     Subcontractor Burchick Construction Company's Payment Application Package No. 4 for Contract 03330-5187 for $135,225.00.

15.     Subcontractor Burchick Construction Company's Payment Application Package No. 5 for Contract 03330-5187 for $45,765.00 and payment check number 724993 dated March 21, 2003.

16.     Subcontractor Burchick Construction Company's Payment Application Package No. 6 for Contract 03330-5187 for $1,108,225.00 and payment check numbers 72660 dated April 24, 2003 and 724993 dated March 21, 2003.

17.     Subcontractor Burchick Construction Company's Payment Application Package No. 7 for Contract 03330-5187 for $1,098,225.00 and payment check number 728501 dated May 15, 2003.

18.     Subcontractor Burchick Construction Company's Payment Application Package No. 8 for Contract 03330-5187 for $345,213.00 and payment check number 730279 dated June 6, 2003.

19.     Subcontractor Burchick Construction Company's Payment Application Package No. 9 for Contract 03330-5187 for $245,358.00.

20.     Subcontractor Burchick Construction Company's Payment Application Package No. 10 for Contract 03330-5187 for $109,114.00.

21.     Subcontractor Burchick Construction Company's Payment Application Package No. 11 for Contract 03330-5187 for $54,557.00.

22.     Subcontractor Burchick Construction Company's Payment Application Package No. 12 for Contract 03330-5187 for $136,333.00.

23.     Subcontractor Burchick Construction Company's Payment Application Package No. 13 for Contract 03330-5187 for $90,613.00, with handwritten note dated August 7, 2003.

24.     Subcontractor Burchick Construction Company's Payment Application Package No. 13 for $90,613.00, without handwritten note.

25.     Subcontractor Burchick Construction Company's Payment Application Package No. 14 for Contract 03330-5187.

26.     July 29, 2003 Subcontractor Burchick Construction Company's Payment Application No. 13 for $90,613.00, with handwritten note dated July 29, 2003.

27.     October 2, 2003 fax transmittal to Bill Boots of HRH from Sue Blank attaching Burchick's Monthly Payroll Report for September 2003 (BUR 0137-0138).

28.     January 8, 2004 fax transmittal to Gregg Rinkus of HRH-UPMC Northwest from Sue Blank attaching man hours worked report for December 2003 (BUR 0139-0142).

29.     September 25, 2003 OCIP (BUR 0143-0144).

30.     November 4, 2002 transmittal letter from Burchick Construction Company to Hospital Building & Equipment Co., Division of HBE Corp. attaching Howard Concrete and AMB Certified Payroll reports (BUR 0196-0222).

31.     October 7, 2002 to October 27, 2002 AMB Certification Reports (BUR 0223-0224).

32.     Collective Exhibit:  October 27, 2002 to September 13, 2003 Payroll Reports of Howard Concrete Pumping.

33.    September 2003 AMB Monthly Payroll Summary (BUR 0277).

34.    November 12, 2002 transmittal letter from AMB Excavating to Sue Blank at Burchick Construction attaching Monthly Payroll for August, September, October 2002 (BUR 0278-0281).

35.    April 1, 2003 transmittal letter from Susan B. Blank of Burchick Construction Company to Jon Alderman of HBE enclosing Monthly Payroll Report for March 203 from AMB Excavating (BUR 0282-0289)

36.    November 11, 2002 AMB Excavating August 2002 Monthly Payroll Report (BUR 0290).

37.    November 11, 2002 AMB Excavating September 2002 Monthly Payroll Report (BUR 0291).

38.    November 11, 2002 AMB Excavating October 2002 Monthly Payroll Report (BUR 0292).

39.    December 17, 2002 AMB Excavating November 2002 Monthly Payroll Report (BUR 0293).

40.    January 20, 2003 AMB Excavating December 2002 Monthly Payroll Report (BUR 0294)

41.    March 4, 2003 fax transmittal from Sue to Chris Chiew attaching Monthly Payroll Reports for AMB Excavating and Burchick for the months of January and February 2003 (BUR 0295-0299).

42.    April 1, 2003 transmittal letter from Susan B. Blank to Jon Alderman at HBE enclosing Monthly Payroll Report for March 2003 from AMB Excavating (BUR 0300-0303).

43.    June 2, 2003 fax transmittal from Sue Blank to Chris Chiew attaching OCIP monthly payroll/man-hour report for AMB Excavating for April 2003 (BUR 0304-0306).

44.    August 13, 2003 fax transmittal from Sue to Bill Boots at HRH attaching AMB's Monthly Payroll Reports for June and July (BUR 0307-0313).

45.    September 30, 2003 fax transmittal from Sue to Bill Boots of HRH attaching AMB's Monthly Payroll Report for August and September 2003 (BUR 0314-0317).

46.    November 12, 2002 fax transmittal from Sue Blank to Chris Chiew of HBE attaching OCIP Monthly Payroll Reports for AMB Excavating for August September and October and Tri-City Steel for September and October (BUR 0318-0319).

47.    June 30, 2003 letter from Susan B. Blank to Brenda Shaffar enclosing AMB Monthly Payroll Report (BUR 0320-0321).

48.    Tri-City September 2002 through August 2003 Monthly Payroll Report (BUR 0322-0326).

49.    February 24, 2003 transmittal letter enclosing Tri-City Steel January 2003 Monthly Payroll (BUR 0327-0328).

50.    March 10, 2003 fax transmittal from Sue  Blank to Bill Boots attaching Tri-City Steel's February 2003 Monthly Payroll Report (BUR 0329-0330).

51.    May 5, 2003 fax transmittal from Sue to Chris Chiew attaching OCIP manhour payroll for March and April 2003 for Tri-City Steel and Burchick (BUR 0331-0336).

52.    July 8, 2003 fax transmittal from Sue to Bill Boots attaching Tri-City Steel's May and June Payroll Reports (BUR 0337-0432).

53.    August 14, 2003 fax transmittal from Sue Blank to Bill Boots attaching Tri-City's July/Final Monthly Payroll Report (BUR 034309345).

54.    September 11, 2003 fax transmittal from Sue to Bill Boots attaching Tri-City Steel's August Monthly Payroll Report (BUR 0346-0347).

55.    September 11, 2003 fax transmittal from Sue to Bill Boots attaching Douglass Pile's July/Final Monthly Payroll Report (BUR 0348-0351).

56.    Burchick Payroll Certifications for August 12, 2002 through October 29, 2002 (BUR 0352-0405).

57.    October 24, 2005 Burchick's Weekly Hours Report (BUR 04070409).

58.    Burchick Certified Payroll Reports for Contract 03330-5195, January 17, 2003 through September 30, 2003 (BUR 0410-0445).

59.    Burchick Certified Payroll Reports for Contract 03330-5187, August 13, 2002 through May 18, 2004 (BUR 0446-0578).

60.    April 2002 UPMC Northwest OCIP and Loss Control Program (D-499-525).

61.    Subcontractor Burchick Payment Application Package No. 1 for Contract 03330-5195 for $945.00 and payment check (BUR 0145-0150).

62.    Subcontractor Burchick Payment Application Package No. 2 for Contract 03330-5195 for $33,084.00 and payment check (BUR 0158-0166).

63.    Subcontractor Burchick Payment Application Package No. 3 for Contract 03330-5195 for $102,366.00 and payment check (Bur 0167-0177).

64.     Subcontractor Burchick Payment Application Package No. 4 for Contract 03330-5195 for $137,160.00 (BUR 0178-0184).

65.     Subcontractor Burchick Payment Application Package No. 5 for Contract 03330-5195 for $47,295.00 (BUR 0185-0193) .

66.     September 25, 2003 Burchick Monthly Payroll Report, September 2003 (BUR 0194-0195).

67.     Subcontractor Burchick Payment Application Package No. 6 for Contract 03330-5195 for $76,680.00.

68.     Subcontractor Burchick Payment Application Package No. 7 for Contract 03330-5195 for $22,085.00.

69.     Subcontractor Burchick Payment Application Package No. 8 for Contract 03330-5195 for $22,085.00.

70.     Subcontractor Burchick Payment Application Package No. 9 for Contract 03330-5195.

71.     Burchick Summary of Receipts on each of Contracts 03330-5187 and 03330-5195.

72.     August 22, 2003 fax transmittal from Dave Meuschke to Jon Alderman attaching proposed billing percentages.

73.     HBE Billing Instructions and Schedule of Values.

74.     HBE Application for Payment No. 18 dated 6/27/03  Invoice No. 5187-18 and related documents.

75.     HBE Application for Payment No. 36 dated 11/04/04  Invoice No. 5187-36 and related documents.

76.     HBE Application for Payment No. 8 dated 9/30/03 Invoice No. 5195 and related documents.

77.     HBE Application for Payment No. 20 dated 10/01/04 Invoice No. 5195-20 and related documents.

78.     May 30, 2003 letter from David P. Meuschke to Jon Alderman.

79.     September 29, 2003 letter from David P. Meuschke to Jon Alderman.

80.     January 6, 2004 letter from David P. Meuschke to George Ehringer.

81.     February 3, 2004 letter from David P. Meuschke to Dan Gemme.

82.     February 4, 2004 Memo to File from Sue Blank.

83.     February 4, 2004 letter from Phillip Bosanquet to Burchick Construction Company.

84.     February 6, 2004 letter from Daniel R. Gemme to George Ehringer.

85.     February 9, 2004 letter from David P. Meuschke to Dan Gemme.

86.     February 10, 2004 letter from David P. Meuschke to Jon Alderman.

87.     February 10, 2004 letter from David P. Meuschke to Phil Bosanquet.

88.     February 11, 2004 letter from David P. Meuschke to Jon Alderman.

89.     February 11, 2004 letter from Phil Bosanquet to Dave Meuschke.

90.     February 13, 2004 letter from David P. Meuschke to Phil Bosanquet.

91.     February 16, 2004 letter from David P. Meuschke to Jon Alderman.

92.     March 2, 2004 letter from David P. Meuschke to Jon Alderman.

93.     March 11, 2004 letter from Phil Bosanquet to Dave Meuschke.

94.     March 11, 2004 letter from Phil Bosanquet to Dave Meuschke.

95.     March 15, 2004 letter from David P. Meuschke to Phil Bosanquet.

96.     March 16, 2004 letter from David P. Meuschke to Phil Bosanquet.

97.     March 22, 2004 letter from David P. Meuschke to Jim Kee.

98.     March 29, 2004 letter from James Kee to David P. Meuschke.

99.     May 5, 2004 letter from Phil Bosanquet to Dave Meuschke.

100.    May 12, 2004 letter from David P. Meuschke to Phil Bosanquet.

101.    May 18, 2004 letter from David P. Meuschke to Jon Alderman.

102.    May 21, 2004 letter from Phil Bosanquet to David Meuschke.

103.    May 25, 2004 letter from David P. Meuschke to Phil Bosanquet.

104.    June 14, 2004 letter from Jon Alderman to Dave Meuschke.

105.    September 1, 2004 letter from David P. Meuschke to Jon Alderman.

106.    HBE Accounts Payable Records and Memorandum Subcontract # 5187 – Hospital.

107.    November 24, 2004 letter from David P. Meuschke to Jon Alderman.

108.    December 1, 2004 letter from Rollin Cooper to David Meuschke.

109.    December 2, 2004 letter from David P. Meuschke to Rollin Cooper.

110.    December 9, 2004 letter from David P. Meuschke to Jon Alderman.

111.    February 4, 2005 letter from David P. Meuschke to Jon Alderman.

112.    April 21, 2005 letter from Brett Goodman to Jim Huber.

113.    June 28, 2005 letter from Brett Goodman to Jim Huber.

114.    July 8, 2005 fax transmittal from George Ehringer to Dave Meuschke attaching July 5, 2005 letter.

115.    July 15, 2005 memorandum from David Meuschke to File.

116.    July 20, 2005 letter from David P. Meuschke to Brett Goodman.

117.    September 21, 2005 letter from Brent L. Motchan to Great American Insurance Company and Burchick Construction Company, Inc.

118.    October 3, 2005 letter from Joel D. Beach to Joseph E. Burchick.

119.    December 9, 2005 Burchick Summary of Legal Expenses Associated with HBE claim.

120.    Standard Specifications for Tolerances for Concrete Construction and Materials (ACI 117-90) and ACI 302.1R-96 "Guide for Concrete Floor and Slab Construction."

121.    Notice of Deposition to HBE Corporation schedule for September 14, 2005, Kee Deposition Ex. 1.

122.    Transcript of Deposition of James Kee as identified above.

123.    Exhibits utilized in Deposition of James Kee.

124.    Sub's Performance and Payment Request for Burchick Construction Co., Inc., Kee Deposition Ex. 12.

125.    HBE Change Order No. 8 with attachments, Kee Deposition Ex. 16.

126.    HBE Change Order 4 with attachments to Thomarios, Kee Deposition Ex. 20.

127.   October 26, 2004 letter from James V. Cowie of Easley & Rivers to Phillip Bosanquet, with attachments, Kee Deposition Ex. 21.

128.   Subcontract between Hospital Building & Equipment and L.O. Bouquin Co., Kee Deposition Ex. 22.

129.   December 2, 2004 letter from David P. Meuschke to Rollin Cooper


Counsel to Defendant/Counterclaim Plaintiff has stipulated to the authenticity of these exhibits, and counsel to both parties will make every reasonable effort to agree as to the admissibility of these exhibits prior to trial.

## V.    LIST OF EXHIBITS THAT BURCHICK MAY OFFER

November 21, 2003 Project Status Report (D-557-565).

OCIP Reconciliation (D-679-690).

OCIP Summary (D-750-751).

November 12, 2001 Memo from Jack C. Kennedy to Eric Cartwright re OCIP (D-762 767).

November 30, 2001 HBE Application and Certificate for Payment, Application No. 1 and December 18, 2001 Requisition to Mellon Bank, Project 023040.

January 14, 2002 HBE Application and Certificate for Payment, Application No. 2 and February 6, 2002 Requisition to Mellon Bank, Project 023040.

February 22, 2002 HBE Application and Certificate for Payment No. 3 and Wire Transfer Request, Project 023040.

March 29, 2002 HBE Application and Certificate for Payment No. 4 and Wire Transfer Request, Project 023040.

June 27, 2002 HBE Application and Certificate for Payment No. 5 and Wire Transfer Request, Project 023040.

August 12, 2002 HBE Wire Transfer Request, Project 023040 .

September 12, 2002 HBE Wire Transfer Request, Project 023040.

October 24, 2002 HBE Wire Transfer Request, Project 023040.

November 12, 2002 HBE Wire Transfer Request, Project 023040.

December 16, 2002 HBE Wire Transfer Request, Project 023040 .

January 14, 2003 HBE Wire Transfer Request, Project 023040.

February 19, 2003 HBE Wire Transfer Request, Project 023040.

March 19, 2003 HBE Wire Transfer Request, Project 023040.

April 9, 2003 HBE Wire Transfer Request, Project 023040.

May 14, 2003 HBE Wire Transfer Request, Project 023040.

June 16, 2003 HBE Wire Transfer Request, Project 023040.

July 17, 2003 HBE Wire Transfer Request, Project 023040.

June 14, 2003 HBE Wire Transfer Request, Project 023040

September 12, 2003 HBE Wire Transfer Request, Project 023040.

October 20, 2003 HBE Wire Transfer Request, Project 023040.

November 17, 2003 HBE Wire Transfer Request, Project 023040 .

December 16, 2003 HBE Wire Transfer Request, Project 023040.

January 16, 2004 HBE Wire Transfer Request, Project 023040.

February 20, 2004 HBE Wire Transfer Request, Project 023040.

March 22, 2004 HBE Wire Transfer Request Project 023040.

April 16, 2004 HBE Wire Transfer Request, Project 023040.

April 19, 1004 HBE Wire Transfer Request, Project 023040.

June 2004 HBE Wire Transfer Request, Project 023040

July 15, 2004 HBE Wire Transfer Request, Project 023040.

August 2004 HBE Wire Transfer Request, Project 023040.

September 2004 HBE Wire Transfer Request, Project 023040.

October 20, 2004 HBE Wire Transfer Request, Project 023040.

December 1, 2004 HBE Wire Transfer Request, Project 023040

September 20, 2004 HBE Wire Transfer Request, Project 023040.

December 16, 2002 HBE Wire Transfer Request, Project 033209.

January 14, 2003 HBE Wire Transfer Request, Project 033209.

February 29, 2003 HBE Wire Transfer Request, Project 033209.

June 16, 2003 HBE Wire Transfer Request, Project 033209.

July 17, 2003 HBE Wire Transfer Request, Project 033209.

August 14, 2003 HBE Wire Transfer Request, Project 033209.

September 15, 2003 HBE Wire Transfer Request, Project 033209.

November 17, 2003 HBE Wire Transfer Request, Project 033209.

December 18, 2003 HBE Wire Transfer Request, Project 033209.

January 16, 2004 HBE Wire Transfer Request, Project 033209.

February 20, 2004 HBE Wire Transfer Request, Project 033209.

February 20, 2004 HBE Wire Transfer Request, Project 033209.

March 22, 2004 HBE Wire Transfer Request, Project 033209.

April 16, 2004 HBE Wire Transfer Request, Project 033209.

May 2, 2004 HBE Wire Transfer Request, Project 033209.

June 2004 HBE Wire Transfer Request, Project 033209.

August 2004 HBE Wire Transfer Request, Project 033209.

September 20, 2004 HBE Wire Transfer Request, Project 033209.

October 20, 2004 HBE Wire Transfer Request, Project 033209.

Construction Records Subcontract # 03330-5187 – Hospital cover sheet.

December 22, 2003 letter from Phil Bosanquet to Dave Meuschke.

December 17, 2003 Jobsite Deficiency Notification.

December 31, 2003 letter from David P. Meuschke to Phil Bosanquet.

January 13, 2004 letter from David P. Meuschke to Phil Bosanquet.

January 26, 2004 letter from Phil Bosanquet to Dave Meuschke.

January 29, 2004 letter from David P. Meuschke to Phil Bosanquet.

February 3, 2004 letter from David P. Mueschke to Phil Bosanquet.

March 2, 2004 letter from David P. Meuschke to Jon Alderman.

March 11, 2004 letter from Phil Bosanquet to Dave Meuschke.

March 11, 2004 letter from Phil Bosanquet to Dave Meuschke.

March 16, 2004 letter from David P. Meuschke to Phil Bosanquet.

March 11, 2004 letter from Phil Bosanquet to Dave Meuschke.

May 5, 2004 letter from Phil Bosanquet to Dave Meuschke.

May 25, 2004 letter from David P. Meuschke to Phil Bosanquet.

August 3, 2004 letter from Jon Alderman to David P. Meuschke.

August 9, 2004 letter from Jon Alderman to David P. Meuschke.

August 4, 2004 letter from David P. Meuschke to Jon Alderman.

November 11, 2003 letter from Susan B. Blank to Brenda Shaffar.

October 2, 2003 notice of authorization of payment to Burchick.

Workers Compensation and Employers Liability Policy.

December 6, 2004 Fax transmission from The Face Companies.

Any document listed by Defendant/Counterclaim Plaintiff in its Pre-Trial Statement.

Any documents by way of rebuttal or impeachment.

Counsel to Defendant/Counterclaim Plaintiff has stipulated to the authenticity of these exhibits, and counsel to both parties will make every reasonable effort to agree as to the admissibility of these exhibits prior to trial.

## VI.   LEGAL ISSUES TO BE ADDRESSED AT
## THE PRE-TRIAL CONFERENCE

Burchick anticipates that Dispositive Motion(s) and/or Motions in Limine will be

submitted which may be addressed at the Pre-Trial Conference.


Respectfully submitted,

s/Kurt F. Fernsler
Kurt F. Fernsler, Esquire
Pa. ID. No. 78026
REED SMITH LLP
Firm No. 234
435 Sixth Avenue
Pittsburgh, PA 15219-1886
Phone:(412) 288-3131
Fax:  (412) 288-3063
E-Mail:  kfernsler@reedsmith.com

## <u>CERTIFICATE OF SERVICE</u>

       A true and correct copy of the foregoing Plaintiff Burchick Construction Company, Inc.'s Pre-Trial Statement was served this 12th day of December, 2005, electronically via the Court's ECF system:

Michael D. Glass, Esquire
Polito & Smock, P.C.
Four Gateway Center, Suite 400
444 Liberty Avenue
Pittsburgh, PA  15222-1237

s/Kurt F. Fernsler