**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BURCHICK CONSTRUCTION COMPANY, INC., | ) ) ) |
| Plaintiff, | ) Civil Docket No. 05-CV-12E ) |
| vs. | ) ) |
| HBE CORPORATION, | ) Judge McLaughlin ) |
| Defendant. | ) (Electronically Filed) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Burchick Construction Company, Inc. ("Burchick"), by and through its undersigned attorneys, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, respectfully files this Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment and requests that an order granting summary judgment in favor of Burchick be entered. References to capitalized terms not otherwise defined have the meanings ascribed to them in the Concise Statement of Material Facts ("Statement"), with Appendix, filed concurrently herewith, the contents of which are incorporated here.

I.      **Introduction and Factual Background**

In 2002, UPMC Northwest ("UPMC"), a Pennsylvania non-profit corporation, determined to construct a new 210,000 square foot hospital (the "Hospital") and a related Behavioral Health Facility (the "BHF") in Seneca, Pennsylvania (the Hospital and the BHF sometimes referred to collectively herein as the "Project"). See Statement at ¶1. UPMC retained

HBE Corporation ("HBE"), to both perform complete design services for the Project, and to act as the general contractor for the construction of the Project. See Statement at ¶1. To that end, UPMC entered into a contract with HBE for $51,542,412.00 (including change orders) for the Hospital, and a contract with HBE for $2,805,433.00 (including change orders) for the BHF. See Statement at ¶2.

HBE retained Burchick to perform certain concrete work on each of the Hospital and BHF projects. Specifically with respect to the Hospital, Burchick and HBE entered into a contract dated August 14, 2002 (the "Hospital Contract"), whereby Burchick would provide the "Concrete and Foundations Package" as that scope of work was enumerated in the contract documents prepared by HBE, for an original principal amount of $2,225,000.00, as finally adjusted by agreed-upon change orders to $2,366,573.00. See Statement at ¶4. Burchick and HBE also entered into a contract dated August 16, 2002 (the "BHF Contract"), whereby Burchick would provide the "Concrete and Foundations Package" on the BHF for an original principal amount of $395,500, as finally adjusted by agreed-upon change orders to $454,708.00. See Statement at ¶5. The language and terms of each of the Hospital Contract and the BHF Contract are identical (the Hospital Contract and the BHF Contract sometimes referred to collectively as the "Contracts"). See Statement at ¶6.

The Contracts, and the parties obligations under them, are subject to Pennsylvania's Contractor and Subcontractor Payment Act, 73 P.S. § 501 et seq. (the "Prompt Pay Act") because they are agreements to perform work on real property within the Commonwealth other than to improvements on six or fewer residential units.

Burchick's work under the Hospital Contract was substantially complete as of May 30, 2003, and Burchick achieved final completion, corrected any work which HBE claimed was

deficient, and performed its required clean-up activities by September 26, 2003. Burchick then submitted its Payment Application No. 13 on July 29, 2003, which requested 100% of the contract balance.[1] See Statement at ¶7. Eventually, albeit late, HBE paid Burchick the balance under the Hospital Contract with the exception of remaining retainage of $60,652.40.

HBE refused to pay Burchick the remaining contract balance, claiming that it had not received payment of retainage from UPMC, and thus did not owe Burchick its final payment of retainage.

However, unbeknownst to Burchick, HBE submitted its certified Payment Application No. 18 to UPMC dated July 18, 2003, requesting payment for 100% of Burchick's work. See Statement at ¶8. UPMC, in fact, paid HBE for 100% of Burchick's work on or about July 25, 2003. See Statement at ¶10. Further, UPMC is holding no more than $159,000 in total retainage from HBE on the entire $51,542,412.00 Hospital project (**.3%**). See Statement at ¶12. UPMC does not hold any retainage from HBE for any item of Burchick's work under the Hospital Contract. See Statement at ¶11.

The payment application and approval process, including the involvement of UPMC, was exactly the same on the BHF Contract as on the Hospital Contract. Burchick submitted monthly payment applications beginning in December 2002. Burchick submitted its Application for Payment No. 8 on October 23, 2003 wherein it represented that its work on the BHF Contract was 100% complete and requested payment for 100% of the balance under the BHF Contract.[2] See Statement at ¶14. HBE, in turn, submitted its Application for Payment No. 8 to UPMC dated September 30, 2003, requesting payment for 100% of Burchick's work. See Statement at

---

[1] Application for Payment 14 was submitted October 29, 2003 requesting payment for change order 5 with a value of $11,913.00. No retainage applied to this change order.

[2] Application for Payment No. 9 was submitted February 4, 2004 to reflect a request for payment for change order No. 2 with a value of $13,008.00. No retainage applied to this request.

¶15.  In fact, UPMC paid HBE for 100% of Burchick's work on the BHF on or about October 24, 2003.  See Statement at ¶17.  UPMC does not hold any retainage from HBE for any item of Burchick's work under the BHF Contract.  See Statement at ¶18.

HBE has failed to pay Burchick the final $48,658.00 of retainage due under the BHF Contract.

HBE did not give notice to Burchick of any alleged "deficiency items" by which HBE may have properly withheld payments under either Contract prior to the date that final payment was due to Burchick under the Contracts.  See Statement at ¶¶19, 20.

Burchick's claims in this Action are simple and straightforward.  Burchick performed all work under each of the Contracts, and otherwise complied with all requirements of those Contracts, that entitle it to be paid the full balance under the Contracts, including retainage.  The Prompt Pay Act mandates that because UPMC paid HBE for all retainage related to Burchick's work, HBE was obligated to pay that retainage to Burchick within 14 days, unless HBE gave timely notice of a "deficiency item."  Because HBE gave no such notice, and Burchick was forced to initiate this Action, HBE is also liable for interest, penalties and attorneys' fees calculated in accordance with the Prompt Pay Act.

**II.     Applicable Legal Standard**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party bears the initial responsibility of identifying the absence of a genuine issue of material fact, and this may be done by identifying an absence of admissible evidence to support an essential element in a non-moving party's case.  See Celotex Corp., 477 U.S. at 325.

Once the moving party has shown the absence of a genuine issue of material fact as to an essential element of the non-movant's case, the burden shifts to the non-moving party to set forth affirmative evidence and specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); See also Aronow Roofing Co. v Gilbane Bldg. Co., 902 F.2d 1127, 1128 (3rd Cir. 1990) ("Summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case.").

The non-moving party must do more than express doubt as to the truth of the moving party's factual submissions, but must show "concrete evidence from which a reasonable jury could return a verdict in his favor." Anderson, 477 U.S. at 256. This evidence must rise above casting "metaphysical doubt" as to a material issue of fact. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

**III.    Argument**

    **A.    HBE Is Liable To Burchick For Retainge And For Interest, Penalties And Attorneys' Fees In Accordance With The Prompt Pay Act**

The Prompt Pay Act applies to the Contracts, and was enacted to protect subcontractors, like Burchick here, from situations in which a general contractor improperly or unreasonably withholds the payment of retainage.

The undisputed material facts relevant to the relief requested by Burchick in the Motion disclose the following: (1) HBE billed UPMC for 100% of Burchick's work on each of the Hospital Contract and the BHF Contract; (2) UPMC paid HBE for 100% of Burchick's work on each such Contract; (3) UPMC does not hold a single dollar of retainage from HBE related in any way to Burchick's work.

Notwithstanding these facts, HBE has refused to pay Burchick its retainage. Discovery conducted in this Action has finally disclosed HBE's true position with respect to what it

maintains are its payment obligations. Specifically, HBE unilaterally created what is essentially a pool of retainage with UPMC which is not specifically allocated to any single subcontractor. Rather, HBE has taken the position that if any retainage is held by UPMC for any reason, HBE may, in its discretion, allocate it among all subcontractors, regardless of whether any of the money is in fact held back because that subcontractor's work is not yet complete. HBE relies on the phrase in the Contracts "which retainage shall be held by Contractor [HBE] until final payment is received by Contractor [HBE] from Owner [UPMC]" to argue that unless and until HBE receives every single dollar for the entire Project from UPMC, it does not owe any retainage to any subcontractor – even where, as here, UPMC holds no more than .3% of the total contract value.

While HBE's "theory" is interesting, it flies in the face of the law - and of reason. Specifically, the Pennsylvania legislature has seen fit to put a stop to this kind of game-playing by big contractors by enactment of the Prompt Pay Act. The Prompt Pay Act specifically addresses "Retainage" at Section 509(c) and (d):

> (c) Payment of retainage to subcontractors – A contractor shall pay to the contractors subcontractors, and each subcontractor shall in turn pay to the subcontractor's subcontractors, within 14 days after receipt of the retainage, the full amount due each subcontractor.
>
> (d) Withholding acceptance or failure to pay retainage – If an owner, contractor or subcontractor unreasonably withholds acceptance of work or fails to pay retainage as required by this section, the owner, contractor or subcontractor shall be subject to the payment of interest at the rate established in section 5(d) on the balance due and owing on the date acceptance was unreasonably withheld or the date the retainage was due and owing, whichever is applicable. The owner, contractor or subcontractor shall also be subject to the provisions of section 12.

Finally the Prompt Pay Act provides at Section 511 "Contractor's withholding of payment for good faith claims":

> (a) Authority to withhold – The contractor or subcontractor may withhold payment from any subcontractor responsible for a deficiency item. The contractor or subcontractor

>shall pay any subcontractor according to the provisions of this act for any item which appears on the invoice and has been satisfactorily completed.
>
>(b) Notice – If a contractor or subcontractor withholds payment from a subcontractor for a deficiency item, it must notify the subcontractor or supplier and the owner of the reason within seven calendar days of the date after receipt of the notice of deficiency item.

The Prompt Pay Act is unequivocal. If the owner pays the general contractor for the subcontractor's retainage, and the general contractor does not give notice of a "deficiency item," prior to the expiration of the 14 day period in Section 509(c), the general contractor must pay the retainage to the subcontractor. Unlike certain provisions of the Prompt Pay Act, which begin with the phrase "Except as otherwise agreed by the parties..." (See §505(d) dealing with interest), this provision may not be modified by contract. This is not by mistake – the ability of a subcontractor to get its retainage, which is often as much as 10% of the contract price, is essential to many subcontractors' survival.

Here, HBE may not eviscerate the Prompt Pay Act by unilaterally creating its own special designation of "retainage" to argue that unless it receives every dollar of retainage on the entire project it has not received 100% of any single subcontractors' retainage.

Further, HBE did not give Burchick notice of any alleged "deficiency items" within the time period prescribed for payment under either Contract, such that it could have properly withheld payment of retainage under Section 511 of the Prompt Pay Act. See Appendix B at pp. 70, 71 and Appendix I.

The Prompt Pay Act does not allow a general contractor to wait and hope it can come up with an after-the-fact backcharge to justify failing to pay contract balances. HBE's actions are in direct contradiction to its duties under the Prompt Pay Act. If HBE receives the retainage from UPMC, and does not give notice of a deficiency item before payment of the retainage is due,

HBE has a mandatory obligation to pay that retainage under the Prompt Pay Act. If they do not, interest shall be imposed under the Prompt Pay Act at 1% per month. If an unpaid subcontractor is forced to initiate litigation to recover, it is entitled to a penalty equal to 1% per month and reasonable attorneys' fees.

Based on these undisputed facts, the Prompt Pay Act dictates the result. HBE is liable for the retainage under each of the Contracts together with interest, penalties and attorneys' fees. Those damages were submitted in Burchick's Pre-Trial Statement filed concurrently herewith as follows:

Hospital Contract

Burchick is entitled to the remaining contract balance under the Hospital Contract of $60,652.40. In addition, pursuant to the Prompt Pay Act, Burchick is entitled to interest at the rate of 1% per month beginning no later than 14 days after receipt of Burchick's payment application for its final payment of retainage (July 29, 2003 plus 14 days – August 13, 2003). Through December 18, 2005 (28 months @ 1% per month), interest has accrued in the amount of $16,982.67. In addition, because Burchick was forced to commence litigation to recover this amount wrongfully withheld, Burchick is entitled to be paid a penalty of 1% per month together with Burchick's attorneys' fees. The penalty of 1% per month has similarly accrued in the amount of $16,982.67. Attorneys' fees for collection efforts for both Contracts currently stand at $33,125.00.

| | |
|---|---|
| Principal Contract Balance: | $60,652.40 |
| Interest through 12-18-05 | $16,982.67 |
| Penalty through 12-18-05 | $16,982.67 |
| Total attorneys' fees to 10-31-05 | $33,125.00 |

|  |  |
|---|---|
| **TOTAL:** | **$127,742.74**[3] |
| (Alternative attorneys' fees based on percentage of total principal claim - $60,652.40/$109,310.40 = 55% [$33,125.00] = | $18,218.75 |
| **ALTERNATE TOTAL:** | **$112,836.49** |

BHF Contract

Burchick is entitled to the remaining contract balance under the BHF Contract of $48,658.00. In addition, pursuant to the Prompt Pay Act, Burchick is entitled to interest at the rate of 1% per month beginning no later than 14 days after receipt of Burchick's payment application for its final payment of retainage (September 30, 2003 plus 14 days – October 14, 2003). Through December 18, 2005 (26 months @ 1% per month), interest has accrued in the amount of $12,651.08. In addition, because Burchick was forced to commence litigation to recover this amount wrongfully withheld, Burchick is entitled to be paid a penalty of 1% per month together with Burchick's attorneys' fees. The penalty of 1% per month has similarly accrued in the amount of $12,651.08. Attorneys' fees for collection efforts for both Contracts currently stand at $33,125.00.

|  |  |
|---|---|
| Principal Contract Balance: | $48,658.00 |
| Interest through 12-18-05 | $12,651.08 |
| Penalty through 12-18-05 | $12,651.08 |
| Attorneys' fees to 10-31-05 | $ included above |
| **TOTAL:** | **$73,960.16**[4] |
| (Alternative attorneys' fees based on percentage of total principal claim - $48,658.00/$109,310.40 = 45% [$33,125.00] = | $14,906.25 |

---

[3] Attorneys' fees, interest and penalties continue to accrue and these damage figures will be updated at trial.

[4] Attorneys' fees, interest and penalties continue to accrue and these damage figures will be updated at trial.

      **ALTERNATE TOTAL**:      **$88,866.41**

      **B.**    **HBE Is Also Liable To Burchick For Retainage Under The Contracts**

While the mandatory requirements of the Prompt Pay Act dictate the result in this matter, even if the Prompt Pay Act didn't exist, the same result is reached under the Contracts.

The Contracts provide, in part:

> Subcontractor shall submit to Contractor monthly applications for progress payments which shall be based upon the Schedule of Values approved by Contractor and shall show the percentage of the Subcontract work completed, less a ten percent (10%) retainage. Said retainage shall be held by Contractor until Subcontractor has substantially performed all of the work in the Subcontract, including any and all extra work, at which time the retainage shall be reduced to five percent (5%) which retainage shall be held by Contractor until final payment is received by Contractor from Owner.
>
> Subcontractor shall be entitled to receive all progress payments and the final payment within ten (10) working days after Contractor receives payment *for such* from the Owner, except as otherwise provided in the Conditions.

See Statement at 4, 5. (emphasis supplied).

As the drafter of these provisions, they must be construed most strongly against HBE. Further, these provisions must be read in conjunction with one another, and construed reasonably in a way to give effect to all provisions if possible.   Here, the phrase "final payment" although used throughout, is not otherwise defined in the Contracts.  Therefore, this "final payment" must necessarily be comprised of the last money held by HBE from Burchick, i.e., the retainage.  The second paragraph of this payment language clarifies that the final payment, i.e., retainage, is due within 10 working days after HBE receives payment *for such*, from UPMC.

A plain reading of the language of the Contracts discloses that the only reasonable interpretation is that the Burchick is owed its retainage when HBE receives payment for Burchick's work from UPMC.  No other interpretation is in accord with the contractual

language, and no other "evidence" could be submitted by HBE as the Contracts are fully integrated writings.

## IV.     Conclusion

For all of the foregoing reasons, Plaintiff, Burchick Construction Company, Inc. respectfully requests that summary judgment be granted in its favor, and against HBE Corporation in accordance with the Proposed Order filed concurrently herewith.

>                             Respectfully submitted,
>
>                             s/Kurt F. Fernsler
>                             Kurt F. Fernsler, Esquire
>                             Pa. ID. No. 78026
>                             REED SMITH LLP
>                             Firm No. 234
>                             435 Sixth Avenue
>                             Pittsburgh, PA 15219-1886
>                             Phone:(412) 288-3131
>                             Fax:  (412) 288-3063
>                             E-Mail:  kfernsler@reedsmith.com

## **CERTIFICATE OF SERVICE**

    A true and correct copy of the foregoing Plaintiff Burchick Construction Company, Inc.'s Memorandum of Law in Support of Motion for Summary Judgment was served this 12th day of December, 2005, electronically via the Court's ECF system:

Michael D. Glass, Esquire
Polito & Smock, P.C.
Four Gateway Center, Suite 400
444 Liberty Avenue
Pittsburgh, PA  15222-1237

                                                            s/Kurt F. Fernsler